**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEAN ALEXANDER; PETER ALLEN; ALBERT ANAYA; SUZANNE ANDRADE; JARRETT HENDERSON; ELY INES; JORGE ISLA; PAUL INFANTINO; ERIK JEPPSON; GUPERTINO MAGANA; BERNARD MENDOZA; JESSE PADILLA; JOEY RODRIGUEZ; DALE ROSE; ALLAN ROSS; AGOSTINO SCALERCIO; DEAN WILEY; ANTHONY YBARRA, on behalf of themselves and all persons similarly situated,<br>                    *Plaintiffs-Appellants*,<br><br>v.<br><br>FEDEX GROUND PACKAGE SYSTEM, INC., DBA FedEx Home Delivery,<br>                    *Defendant-Appellee.* | No. 12-17458<br><br>D.C. No.<br>3:05-cv-00038-EMC |
| DEAN ALEXANDER; PETER ALLEN; ALBERT ANAYA; SUZANNE ANDRADE; JARRETT HENDERSON; ELY INES; JORGE ISLA; PAUL INFANTINO; ERIK JEPPSON; GUPERTINO MAGANA; BERNARD MENDOZA; JESSE PADILLA; JOEY | No. 12-17509<br><br>D.C. No.<br>3:05-cv-00038-EMC |

2                    ALEXANDER V. FEDEX

RODRIGUEZ; DALE ROSE; ALLAN          OPINION
ROSS; AGOSTINO SCALERCIO; DEAN
WILEY; ANTHONY YBARRA, on
behalf of themselves and all persons
similarly situated,
                    *Plaintiffs-Appellees*,

                    v.

FEDEX GROUND PACKAGE SYSTEM,
INC., DBA FedEx Home Delivery,
                    *Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted
March 6, 2014—Portland, Oregon

Filed August 27, 2014

Before: Alfred T. Goodwin, Stephen S. Trott,
and William A. Fletcher, Circuit Judges.

Opinion by Judge W. Fletcher;
Concurrence by Judge Trott

## SUMMARY[*]

### California Law

The panel reversed the Multidistrict Litigation Court's grant of summary judgment entered in favor of FedEx Ground Package System, Inc., and its denial of a plaintiff class of FedEx drivers' motion for partial summary judgment in a class action alleging that FedEx drivers in California were employees rather than independent contractors.

The panel held that the plaintiff FedEx drivers were employees as a matter of law under California's right-to-control test. The panel remanded to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status.

Judge Trott, joined by Judge Goodwin, concurred. Judge Trott wrote that FedEx's labeling of the drivers as "independent contractors" in its Operating Agreement did not conclusively make them so.

## COUNSEL

Beth A. Ross (argued), Aaron D. Kaufmann, and Elizabeth C. Morris, Leonard Cardner, LLP, Oakland, California; and Ellen Lake, Oakland, California, for Plaintiffs-Appellants/Cross-Appellees.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

4                    ALEXANDER V. FEDEX

Jonathan Hacker (argued), O'Melveny & Myers LLP, Washington, D.C.; Anton Metlitsky, O'Melveny & Myers LLP, New York, New York; Chris Hollinger, O'Melveny & Myers LLP, San Francisco, California; Carolyn Kubota and Robert Swerdlow, O'Melveny & Myers LLP, Los Angeles, California, for Defendant-Appellee/Cross-Appellant.

Richard Pianka, Arlington, Virginia, for Amici Curiae American Trucking Associations, Inc., and California Trucking Association.

---

**OPINION**

W. FLETCHER, Circuit Judge:

As a central part of its business, FedEx Ground Package System, Inc. ("FedEx"), contracts with drivers to deliver packages to its customers. The drivers must wear FedEx uniforms, drive FedEx-approved vehicles, and groom themselves according to FedEx's appearance standards. FedEx tells its drivers what packages to deliver, on what days, and at what times. Although drivers may operate multiple delivery routes and hire third parties to help perform their work, they may do so only with FedEx's consent.

FedEx contends its drivers are independent contractors under California law. Plaintiffs, a class of FedEx drivers in California, contend they are employees. We agree with plaintiffs.

## I. Background

### A. Factual Background

Named plaintiffs represent a class comprising approximately 2300 individuals who were full-time delivery drivers for FedEx in California between 2000 and 2007. Plaintiff class members worked for FedEx's two operating divisions, FedEx Ground and FedEx Home Delivery. FedEx Ground deals primarily with business-to-business deliveries, while FedEx Home Delivery deals primarily with residential deliveries. The differences between the two divisions do not matter to this appeal.

FedEx characterizes its drivers as independent contractors. FedEx's Operating Agreement ("OA") governs its relationship with the drivers. The OA's "Background Statement" provides:

> [T]his Agreement will set forth the mutual business objectives of the two parties . . . but the manner and means of reaching these results are within the discretion of the [driver], and no officer or employee of FedEx . . . shall have the authority to impose any term or condition on [the driver] . . . which is contrary to this understanding.

A provision of the OA titled "Discretion of Contractor to Determine Method and Means of Meeting Business Objectives," states:

> [N]o officer, agent or employee of FedEx . . . shall have the authority to direct [the driver]

> as to the manner or means employed . . . .  For example, no officer, agent or employee of FedEx . . . shall have the authority to prescribe hours of work, whether or when the [driver] is to take breaks, what route the [driver] is to follow, or other details of performance.

FedEx's relationship with its drivers also is governed by various policies and procedures prescribed by FedEx.

### 1. Job Requirements

The OA requires FedEx drivers to pick up and deliver packages within their assigned "Primary Service Area[s]." Drivers must deliver packages every day that FedEx is open for business, and must deliver every package they are assigned each day.  They must deliver each package within a specific window of time negotiated between FedEx and its customers.  After each delivery, drivers must use an electronic scanner to send data about the delivery to FedEx. FedEx does not require drivers to follow specific delivery routes.  However, FedEx tells its managers to design and recommend to its drivers routes that will "reduce travel time" and "minimize expenses and maximize earnings and service."

FedEx does not expressly dictate working hours, but it structures drivers' workloads to ensure that they work between 9.5 and 11 hours every working day.  If a driver's manager determines that the driver has more work than he or she "can  reasonably be expected to handle" in a 9.5 to 11-hour day, the manager may reassign part of the driver's workload to other drivers.  Drivers are compensated according to a somewhat complex formula that includes per-day and per-stop components.  Drivers are expected to arrive

at their delivery terminals each morning, and they are not supposed to leave the terminal until all of their packages are available for pick-up. FedEx instructs managers to make sure that drivers properly fill out their paperwork and prepare their packages for delivery. Each terminal sets a time by which all drivers must return at the end of the day. If drivers want their trucks loaded by FedEx's package-handlers, they must leave their trucks at the terminal overnight.

The OA gives FedEx the authority to "reconfigure" a driver's service area upon five days' written notice. Drivers have the right to propose a plan to avoid reconfiguration, "using means satisfactory to FedEx." FedEx "may, in its sole discretion," reject a plan that does not "provide reasonable means to continue" the driver's service area. Should a driver's service area be reconfigured in such a way that the driver gains customers, FedEx may reduce that driver's pay to compensate other drivers who lost customers in the reconfiguration.

FedEx trains its drivers on how best to perform their job and to interact with customers. The OA provides that, during the first 30 days of the contract term, FedEx "shall . . . familiarize [drivers] with various quality service procedures developed by FedEx." The OA requires drivers to conduct themselves "with integrity and honesty, in a professional manner, and with proper decorum at all times." They must "[f]oster the professional image and good reputation of FedEx."

A driver's managers may conduct up to four ride-along performance evaluations each year, "to verify that [the driver] is meeting the standards of customer service" required by the OA. Managers are supposed to observe and record small

details about each step of a delivery, including whether a driver uses a "dolly or cart" to move packages, demonstrates a "sense of urgency," and "[p]laces [his or her] keys on [the] pinky finger of [his or her] non-writing hand" after locking the delivery vehicle. After finishing a ride-along evaluation, managers are supposed to give immediate feedback to drivers about the quality of their work. FedEx contends in this litigation that this feedback constitutes mere recommendations that drivers are free either to follow or disregard.

Drivers must follow FedEx's "Safe Driving Standards." These standards prohibit many illegal acts, such as "[d]riving while under the influence of alcohol or drugs" and "[u]sing a motor vehicle in the commission of a felony." They also forbid some legal conduct, including "[d]riving a motor vehicle in a speed exhibition, contest or drag race" and "[c]arrying passengers not authorized by FedEx."

The OA allows drivers to operate more than one vehicle and route, but only "with the consent of FedEx" and only if "consistent with the capacity of the [driver's] terminal." Drivers may also hire third parties to help perform their work. Third-party helpers must be "qualified pursuant to applicable federal, state and municipal safety standards and [FedEx's] Safe Driving Standards." They must be "fully trained" and must "conform fully" with the OA. Drivers "in good standing" under the OA may assign their rights and obligations to replacement drivers, but any such replacement must be "acceptable to FedEx."

Drivers enter into the OA for an initial term of one, two, or three years. At the end of the initial term, the OA provides for automatic renewal for successive one-year terms if neither

party provides notice of their intent not to renew. The OA may be terminated (1) by the parties' mutual agreement; (2) for cause, including a breach of any provision of the OA; (3) if FedEx stops doing business or reduces operations in all or part of the driver's service area; or (4) upon thirty days' written notice by the driver. The OA requires drivers to submit claims for wrongful termination to arbitration.

### 2. Equipment and Appearance Requirements

FedEx requires its drivers to provide their own vehicles. Vehicles must not only meet "all applicable federal, state and municipal laws and regulations," but also must be specifically approved by FedEx. The OA allows FedEx to dictate the "identifying colors, logos, numbers, marks and insignia" of the vehicles. All vehicles must be painted "FedEx white," a specific shade of Sherwin-Williams paint, or its equivalent. They must be marked with the FedEx logo, and "maintained in a clean and presentable fashion free of body damage and extraneous markings." FedEx requires vehicles to have specific dimensions, and all vehicles must also contain shelves with specific dimensions. FedEx requires that a "typical package van" have

> two [shelves] per side, full length of the body. They should be 24" (-1", +3") deep with a 1" to 2" pitch and a front lip not to exceed 2" height. Top shelf to bottom of roof or roof bow should be 24" minimum. The lower shelf lip to the bottom of the top shelf should be 24" (+/- 3/4"). Aluminum is the preferred material, however marine grade plywood is acceptable.

Managers may refuse to let drivers work if their vehicles do not meet these requirements.

Drivers must provide maintenance at their own expense and must "bear all costs and expenses incidental to operation" of the vehicle. Drivers authorize FedEx to pay for vehicle licensing, taxes, and fees, and to deduct these costs from the drivers' pay. The OA gives FedEx

> such exclusive possession, use, and control of the [vehicle as] required by . . . applicable regulations, but [FedEx] shall have no right or authority . . . to operate the [vehicle] for any purpose (except for incidental yard movement and positioning) unless the [vehicle] is driven either by [the driver] or by an operator engaged by [the driver].

The OA requires that while vehicles are "in the service of FedEx," they must be used "exclusively for the carriage of the goods of FedEx . . . and for no other purpose." Drivers may use their vehicles "for other commercial or personal purposes when [they are] not in the service of FedEx," but only if all "identifying numbers, marks, logos and insignia" are removed or covered up.

FedEx offers a "Business Support Package," which provides drivers with uniforms, scanners, and other necessary equipment. FedEx deducts the cost of the equipment from drivers' pay. Purchase of the package is ostensibly optional, but more than 99 percent of drivers purchase it. The scanners that drivers must use to send delivery information to FedEx are not readily available from any other source.

The OA requires drivers to comply with personal-appearance standards and wear a FedEx uniform "maintained in good condition." The required uniform includes a uniform shirt with the FedEx logo, uniform pants or shorts, dark shoes and socks, and, if the driver chooses to wear a jacket or cap, a uniform jacket and cap with the FedEx logo. Drivers must keep their "personal appearance consistent with reasonable standards of good order as . . . promulgated from time to time by FedEx." Drivers must be "clean shaven, hair neat and trimmed, free of body odor." Managers may refuse to let drivers work if they are improperly dressed or groomed.

## B. Procedural History

This appeal involves a class action originally filed in the California Superior Court in December 2005 on behalf of a class of California FedEx drivers, asserting claims for employment expenses and unpaid wages under the California Labor Code on the ground that FedEx had improperly classified the drivers as independent contractors. Plaintiffs also brought claims under the federal Family and Medical Leave Act ("FMLA"), which similarly turned on the drivers' employment status. FedEx removed to the Northern District of California based on diversity.

Between 2003 and 2009, similar cases were filed against FedEx in approximately forty states. The Judicial Panel on Multidistrict Litigation consolidated these FedEx cases for multidistrict litigation ("MDL") proceedings in the District Court for the Northern District of Indiana ("the MDL Court"). Plaintiffs moved for class certification. They represented to the MDL Court that their claims would rely only on "common proof applicable to members of the class as whole." The MDL Court certified a class for plaintiffs' claims under

California law.  It declined to certify plaintiffs' proposed national FMLA class.

Plaintiffs in all the MDL cases moved for partial summary judgment, seeking to establish their status as employees as a matter of law.  In most cases, including this one, FedEx cross-moved for summary judgment. The MDL Court denied nearly all of the MDL plaintiffs' motions for summary judgment and granted nearly all of FedEx's motions, holding that plaintiffs were independent contractors as a matter of law in each state where employment status is governed by common-law agency principles.

The MDL Court remanded this case to the district court to resolve the drivers' claims under the FMLA.  Those claims were settled, and the district court entered final judgment.  Plaintiffs timely appealed, challenging the MDL Court's grant of summary judgment to FedEx on the employment status issue.  FedEx conditionally cross-appealed, arguing that if we reverse the MDL Court's grant of summary judgment to FedEx, we should also reverse the MDL Court's class certification decision.

## II.  Standard of Review

We review de novo the district court's decision whether to grant summary judgment, viewing the facts in the light most favorable to the non-moving party.  *Fichman v. Media Ctr.*, 512 F.3d 1157, 1159 (9th Cir. 2008).  "A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting Fed. R. Civ. P. 56(a)).

## III. Discussion

### A. Summary Judgment on Employment Status

The MDL Court granted summary judgment to FedEx, holding that plaintiffs are independent contractors as a matter of law. To reach that conclusion, the MDL Court purported to apply the common law test from *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989), but ultimately focused on the entrepreneurial opportunities FedEx afforded to plaintiffs. The MDL Court explained: "the right to control, though a primary consideration, isn't dispositive; what is dispositive here is the drivers' class-wide ability to own and operate distinct businesses, own multiple routes, and profit accordingly." Plaintiffs argue that, at a minimum, summary judgment for FedEx was inappropriate. They argue further that the district court should have granted their motion for summary judgment because they are employees as a matter of law. We agree that plaintiffs are employees as a matter of law. Accordingly, we reverse the MDL Court and remand to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status.

The parties agree that California law controls this dispute. The parties further agree that determinations of employment status under California law are governed by the multi-factor test set forth in *Borello*. "Even if one or two of the individual factors might suggest an [independent contractor] relationship, summary judgment is nevertheless proper when . . . all the factors weighed and considered as a whole establish . . . an [employment] and not an [independent contractor relationship.]" *Arnold v. Mut. of Omaha Ins. Co.*, 135 Cal. Rptr. 3d 213, 221 (Ct. App. 2011).

We conclude that summary judgment for plaintiffs is appropriate in this case. The facts are largely undisputed. FedEx and plaintiffs agree that their working relationship is controlled by the OA and FedEx's policies and procedures. They dispute only the extent to which those documents give FedEx the right to control its drivers. In California, the meaning of a contract such as the OA is a question of law, unless it is ambiguous and there is "conflicting extrinsic evidence" from which a jury could resolve the ambiguity in favor of either party. *Scheenstra v. Cal. Dairies, Inc.*, 153 Cal. Rptr. 3d 21, 38–39 (Ct. App. 2013). Here, much of the OA is not ambiguous. To the extent it is ambiguous, the extrinsic evidence supports a conclusion that FedEx has the right to control its drivers. Viewing the evidence in the light most favorable to FedEx, we conclude that plaintiffs are employees.

## B. Right-to-Control Test

California's right-to-control test requires courts to weigh a number of factors: "The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." *Borello*, 769 P.2d at 404 (quoting *Tieberg v. Unemployment Ins. App. Bd.*, 471 P.2d 975, 977 (Cal. 1970) (alteration and internal quotation marks omitted)). California courts also consider "several 'secondary' indicia of the nature of a service relationship." *Id.* The right to terminate at will, without cause, is "[s]trong evidence in support of an employment relationship." *Id.* (quoting *Tieberg*, 471 P.2d at 979 (internal quotation marks omitted)). Additional factors include:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id*. These factors "[g]enerally . . . cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Id.* at 404 (quoting *Germann v. Workers' Comp. Appeals Bd.*, 176 Cal. Rptr. 868, 871 (Ct. App. 1981) (internal quotation marks omitted)).

### 1. "Manner and Means"

FedEx argues that the OA creates an independent-contractor relationship. California law is clear that "[t]he label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." *Id.* at 403. What matters is what the contract, in actual effect, allows or requires. *See, e.g.*, *Empire Star Mines Co. v. Cal.*

*Emp't Comm'n*, 168 P.2d 686, 692 (Cal. 1946) ("If the employer has the authority to exercise . . . control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists."), *overruled on other grounds by People v. Sims*, 651 P.2d 321 (Cal. 1982). The OA and FedEx's policies and procedures unambiguously allow FedEx to exercise a great deal of control over the manner in which its drivers do their jobs. Therefore, this factor strongly favors plaintiffs.

First, FedEx can and does control the appearance of its drivers and their vehicles. FedEx controls its drivers' clothing from their hats down to their shoes and socks. It requires drivers to be "clean shaven, hair neat and trimmed, [and] free of body odor." FedEx's detailed appearance requirements clearly constitute control over its drivers. *See Ruiz v. Affinity Logistics Corp.*, No. 12-56589, 2014 WL 2695534, at *7 (9th Cir. June 16, 2014) (finding right to control under California law where a delivery company controlled "'every exquisite detail' of the drivers' appearance, including the 'color of their socks' and 'the style of their hair'"); *cf. Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 859 (8th Cir. 2010) (holding, under Missouri law, that FedEx's appearance requirements "show the extent of FedEx's control" over drivers' work).

FedEx requires drivers to paint their vehicles a specific shade of white, mark them with the distinctive FedEx logo, and to keep their vehicles "clean and presentable [and] free of body damage and extraneous markings." These requirements go well beyond those imposed by federal regulations. *See* 49 C.F.R. § 390.21. FedEx dictates the vehicles' dimensions, including the dimensions of their "package shelves" and the materials from which the shelves are made. Managers may

prevent drivers from working if they are improperly dressed or groomed, or if their vehicles do not meet specifications.

Second, FedEx can and does control the times its drivers can work.  Although the OA does not allow FedEx to set specific working hours down to the last minute, it is clear from the OA that FedEx has a great deal of control over drivers' hours.  FedEx structures drivers' workloads so that they have to work 9.5 to 11 hours every working day.  FedEx argues that, because drivers can hire helpers to do their work for them, they are free to complete a full day's work in less than 9.5 hours.  But managers may adjust drivers' workloads to ensure that they never have more or less work than can be done in 9.5 to 11 hours.  Drivers are not supposed to leave their terminals in the morning until all of their packages are available, and they must return to the terminals no later than a specified time.  If drivers want their vehicles loaded, they must leave them at the terminal overnight.  The combined effect of these requirements is substantially to define and constrain the hours that FedEx's drivers can work.

Third, FedEx can and does control aspects of how and when drivers deliver their packages.  It assigns each driver a specific service area, which it "may, in its sole discretion, reconfigure."  It tells drivers what packages they must deliver and when.  It negotiates the delivery window for packages directly with its customers.  The OA requires drivers to comply with "standards of service," including requirements to "[f]oster the professional image and good reputation of FedEx" and to "conduct all business activities with . . . proper decorum at all times."

FedEx notes that there are details of its drivers' work that it does not control.  For instance, it does not require drivers to

18                    ALEXANDER V. FEDEX

follow specific routes or to deliver packages in a specific order.  Taking the evidence in the light most favorable to FedEx, it does not require drivers to follow managers' recommendations after ride-along evaluations.  But the right-to-control test does not require absolute control.  Employee status may still be found where "[a] certain amount of . . . freedom is inherent in the work."  *Air Couriers Int'l v. Emp't Dev. Dep't*, 59 Cal. Rptr. 3d 37, 44 (Ct. App. 2007); *see also id.* at 47 (upholding trial court's finding that there was "no inconsistency between employee status and the driver's discretion on when to take breaks or vacation").  FedEx's lack of control over some parts of its drivers' jobs does not counteract the extensive control it does exercise.

FedEx argues that it controls its drivers only with respect to the results it seeks, not the manner and means in which drivers achieve those results.  *See Millsap v. Fed. Express Corp.*, 277 Cal. Rptr. 807, 811 (Ct. App. 1991) ("If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established.").  We agree with FedEx that "results," reasonably understood, refers in this context to timely and professional delivery of packages.  Some but not all of FedEx's requirements go to the "results" of its drivers' work so understood.  Most obviously, no reasonable jury could find that the "results" sought by FedEx includes detailed specifications as to the delivery driver's fashion choices and grooming.  *See Ruiz*, 2014 WL 2695534, at *7 & n.5.  And no reasonable jury could find that the "results" FedEx seeks include having all of its vehicles containing shelves built to exactly the same specifications.  Other aspects of FedEx's control—such as limiting drivers to a specific service area with specific delivery locations—also are not merely control of results under California law.

Notably, in *Estrada v. FedEx Ground Package System, Inc.*, 64 Cal. Rptr. 3d 327 (Ct. App. 2007), the California Court of Appeal affirmed a trial court's determination, following a bench trial, that a class of FedEx drivers, working under the same OA as plaintiffs in this case during an overlapping time period, were employees based on "FedEx's control over every exquisite detail of the drivers' performance." *Id.* at 336. FedEx attempts to distinguish *Estrada* on two grounds. First, the trial court in *Estrada* specifically excluded multiple-route drivers from the class, deciding the question of employment status only with respect to single-route drivers, whereas here, while limited to drivers who personally drive full time for FedEx, the class includes a number of drivers who operate more than one route. Second, FedEx contends that "*Estrada* involved a fundamentally different evidentiary record." However, the OA grants FedEx identical rights to control both single-route and multiple-route drivers. And while *Estrada*'s reliance on specific factual findings by the trial court means that *Estrada* is not dispositive here, the *Estrada* court's reasoning is nonetheless apposite.

FedEx argues that the OA gives drivers "flexibility and entrepreneurial opportunities that no 'employee' has." However, in *Borello*, the California Supreme Court reasoned that "[a] business entity may not avoid its statutory obligations by carving up its production process into minute steps, then asserting that it lacks 'control' over the exact means by which one such step is performed by the responsible workers." 769 P.2d at 408. There, S.G. Borello & Sons, a commercial produce grower, hired agricultural laborers under written "sharefarmer" agreements. The agreements recited that the parties deemed themselves

"principal and independent contractor rather than employer and employee." *Id.* at 401.

The sharefarmers agreed to harvest the crop, assisted by members of their families. They could "contract for the amount of land they wish[ed] to harvest on a first-come, first-served basis." *Id.* at 402. The sharefarmers were "totally responsible for the care of the plants in their assigned plots during the harvest period." *Id.* (internal quotation marks omitted). They were required to furnish their own tools and their own transportation to and from the field. "The method and manner of accomplishing" the harvest was left solely to the sharefarmers, though they agreed to "utilize accepted agricultural practices in order to provide for the maximum harvest." *Id.* (internal quotation marks omitted).

The sharefarmers set their own hours. They were free to decide when to pick the crop in order to maximize the profit. "Profit incentive [was] the only guaranty of performance and quality control." *Id*. Borello had "no right to discharge a sharefarmer or his workers during the harvest, and no recourse if the harvesters abandon[ed] the field." *Id.* Although the sharefarmers had significant autonomy over the harvest itself, the California Supreme Court reasoned that Borello retained "all *necessary* control over the harvest portion of its operations," and held that the sharefarmers were employees as a matter of law. *Id.* at 408, 410 (emphasis in original).

California courts have since applied *Borello*'s "all *necessary* control" test and found employee status in several cases involving delivery drivers. For example, in *JKH Enterprises, Inc. v. Department of Industrial Relations*, 48 Cal. Rptr. 3d 563, 568 (Ct. App. 2006), drivers, who had

acknowledged their independent contractor status in writing prior to their engagement with JKH, performed courier work, using their own vehicles to pick up items from JKH's customers and delivering the packages to designated locations.

> Other than to satisfy the general assurances given by JKH to its customers that their packages w[ould] reach the appropriate local destination within two to four hours from pick-up, the . . . drivers [were] not governed by particular rules and they d[id] not receive direction from JKH about how to perform the delivery task or what driving routes to take.

*Id.* at 569.  The California Court of Appeal found that, because "JKH retained all *necessary* control" over the drivers, substantial evidence supported a finding of an employee relationship.  *Id.* at 579.  Similarly, in *Air Couriers*, the Court of Appeal affirmed a trial court's finding of employee status based on its conclusion that an employer retained all necessary control over courier drivers.  59 Cal. Rptr. 3d at 41–42.

FedEx argues that *JKH Enterprises* and *Air Couriers* are distinguishable on the ground that those cases involved California's workers' compensation laws and thus involved a statutory presumption of employee status that does not apply here.  But California courts have recognized that "the burden of proof is on the party attacking the employment relationship," *Bemis v. People*, 240 P.2d 638, 644 (Cal. Dist. Ct. App. 1952), in a range of cases outside of the workers' compensation context.  *See, e.g.*, *Robinson v. George*,

105 P.2d 914, 916 (Cal. 1940); *Faigin v. Signature Grp. Holdings, Inc.*, 150 Cal. Rptr. 3d 123, 133 n.4 (Ct. App. 2012); *Lujan v. Minagar*, 21 Cal. Rptr. 3d 861, 868 (Ct. App. 2004); *see also Narayan v. EGL, Inc.*, 616 F.3d 895, 900 (9th Cir. 2010) (holding that once drivers had established a prima facie case of employment status by coming forward with evidence that they provided services for the company, the burden shifted to the company to establish by a preponderance of the evidence that the drivers were independent contractors).

The *Borello* court noted that the "'control-of-work-details' test for determining [employee status] must be applied with deference to the purposes of the protective legislation." 769 P.2d at 406. But the California Supreme Court does not read *Borello* to apply only in the context of workers' compensation claims. In fact, in *Borello* itself, the court stated that its ruling in that case had implications beyond workers' compensation laws. *Id.* at 400. Recently, in *Ayala v. Antelope Valley Newspapers, Inc.*, 327 P.3d 165 (Cal. 2014), the California Supreme Court recognized the applicability of *Borello*'s "all *necessary* control" test in a determination of employment status in a suit for wage and hour protections. *Id.* at 171. And in *Ruiz*, we applied *Borello*'s "all *necessary* control" test where a plaintiff raised a number of claims unrelated to workers' compensation, including claims for failure to pay sick leave, vacation, holiday, and severance wages. 2014 WL 2695534, at *1.

In contrast to the facts in *JKH Enterprises* and *Air Couriers*, in *Arnold* an insurance company's nonexclusive insurance agent "used her own judgment in determining whom she would solicit for applications for [the company]'s products, the time, place, and manner in which she would

ALEXANDER V. FEDEX                23

solicit, and the amount of time she spent soliciting for [the company]'s products." 135 Cal. Rptr. 3d at 220  The California Court of Appeal held on these facts that the agent was an independent contractor. *Id.* at 220–21. Similarly, the California Court of Appeal held in *State Compensation Insurance Fund v. Brown*, 38 Cal. Rptr. 2d 98 (Ct. App. 1995), that truck drivers were independent contractors where they had "complete control over their working conditions and the manner in which a load is transported (including whether or not to hire assistants), and [were] entirely free to accept or reject an assignment without reprisal." *Id.* at 105; *see also Millsap*, 277 Cal. Rptr. at 811 (holding that a driver was an independent contractor where he used his own car to deliver packages, was paid on a "per route" basis, and "[o]ther than to say 'be careful' or to give him directions to a particular location, . . . [the company] did not instruct [the driver] as to how to make the deliveries or how to drive his car.").

FedEx treats its drivers more like the drivers in *JKH Enterprises* and *Air Couriers* than like the insurance agent in *Arnold* and the drivers in *Brown* and *Millsap*. Indeed, in many respects FedEx exercises greater control over its drivers than was exercised over the drivers in *JKH Enterprises* and *Air Couriers*. FedEx requires its drivers to load and unload packages at FedEx terminals every working day. "Such regular schedules are consistent with employee status and reflect employer control." *Air Couriers*, 59 Cal. Rptr. 3d at 47. FedEx assigns each driver a specified service area and tells drivers where in their service area to deliver packages. FedEx drivers have no control over which packages they deliver. FedEx "obtain[s] the clients in need of the service and provid[es] the workers to conduct it," *JKH Enters.*, 48 Cal. Rptr. 3d at 579. "Drivers deliver[] packages to [FedEx]'s customers, not to their own customers.  [FedEx]

set[s] the rates charged to customers, bill[s] the customers, and collect[s] payment." *Air Couriers*, 59 Cal. Rptr. 3d at 47; *see also Toyota Motor Sales U.S.A., Inc. v. Superior Ct.*, 269 Cal. Rptr. 647, 653 (Ct. App. 1990) (finding a driver to be an employee where the company "determined what would be delivered, when and to whom and what price would be charged"). FedEx pays the drivers on a regular schedule. *See Air Couriers*, 59 Cal. Rptr. 3d at 47; *JKH Enters.*, 48 Cal. Rptr. 3d at 580.

According to FedEx, its drivers' "entrepreneurial opportunities"—the ability to take on multiple routes and vehicles and to hire third-party helpers—are inconsistent with employee status. FedEx relies not on California law for this argument, but on the D.C. Circuit's decision in *FedEx Home Delivery v. National Labor Relations Board*, 563 F.3d 492 (D.C. Cir. 2009). In *FedEx Home Delivery*, a divided panel of the D.C. Circuit reversed an agency decision that FedEx drivers were employees. *Id.* at 495. The majority "shift[ed the] emphasis away from the unwieldy control inquiry," asking instead "whether the putative independent contractors have significant entrepreneurial opportunity for gain or loss." *Id.* at 497 (alteration in original) (internal quotation marks omitted). It held that the evidence "favoring a finding the [drivers] are employees [was] clearly outweighed by evidence of entrepreneurial opportunity." *Id.* at 504.

The D.C. Circuit's decision in *FedEx Home Delivery*, even if correct, has no bearing on this case. There is no indication that California has replaced its longstanding right-to-control test with the new entrepreneurial-opportunities test developed by the D.C. Circuit. Instead, California cases indicate that entrepreneurial opportunities do not undermine a finding of employee status. In *Arzate v. Bridge Terminal*

*Transport, Inc.*, 121 Cal. Rptr. 3d 400 (Cal. App. 2011), the California Court of Appeal reversed a trial court's grant of summary judgment to the defendant where, as here, the "plaintiffs drove their own trucks and paid the related expenses, [and] could have leased more than one truck to defendant and hired other drivers." *Id.* at 405–06. The court found that these opportunities did not override other factors in California's multi-factor analysis such that the drivers were independent contractors as a matter of law. *Id.* In *Narayan*, we concluded that, where drivers "retained the right to employ others to assist in performing their contractual obligations," but the company had to approve all helpers, this was indicative of control of the details of the drivers' performance under California law. 616 F.3d at 902. And in *Ruiz*, we found that drivers were employees where the company "retained ultimate discretion to approve or disapprove of those helpers and additional drivers." 2014 WL 2695534, at *8. "[A]pproval was largely based upon neutral factors, such as background checks required under federal regulations," but the drivers nonetheless "did not have an unrestricted right to choose these persons, which is an "important right[] [that] would normally inure to a self-employed contractor." *Id.* (alterations in original) (quoting *Borello*, 769 P.2d at 408 n.9). Further, "any additional drivers were subject to the same degree of control exerted by Affinity over the drivers generally." *Id.*

The entrepreneurial opportunities available to FedEx's drivers are equivalent to those in *Narayan* and *Ruiz*. The OA allows drivers to operate more than one vehicle or route only if FedEx consents, and only if doing so is "consistent with the capacity of the [driver's] terminal." Drivers must be "in good standing" in order to assign their contractual rights, and any replacement driver must be "acceptable to FedEx." Nothing

in the OA limits FedEx's discretion to withhold consent to additional vehicles or routes, or to decide whether a replacement driver is "acceptable." Daniel Sullivan, FedEx's founder and CEO until January 2007, testified in his deposition that FedEx may refuse to let a driver take on additional routes or sell his route to a third party. He further testified that FedEx's senior managers have the authority to reject proposed replacement drivers based on failure to meet FedEx standards such as grooming requirements. "The existence of the right of control and supervision establishes the existence of an agency relationship." *Ayala*, 327 P.3d at 173 (quoting *Malloy v. Fong*, 232 P.2d 241, 249 (Cal. 1951) (internal quotation marks omitted)). Whether FedEx ever exercises its right of refusal is irrelevant; what matters is that the right exists. *See id*. ("It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent." (quoting *Malloy*, 232 P.2d at 249) (internal quotation marks omitted)).

## 2. Secondary Factors

In light of the powerful evidence of FedEx's right to control the manner in which drivers perform their work, none of the remaining right-to-control factors sufficiently favors FedEx to allow a holding that plaintiffs are independent contractors. *See Borello*, 769 P.2d at 404 (identifying evidence of the right to control as the "principal" factor); *JKH Enters.*, 48 Cal. Rptr. 3d at 579–80 (holding, where JKH's retention of "all *necessary* control over the operation as a whole" was, under *Borello*, "enough to find an employment relationship," that no "single factor, either alone or in combination, mandate[d] a different result").

ALEXANDER V. FEDEX                 27

The first factor, the right to terminate at will, slightly favors FedEx.  The OA contains an arbitration clause and does not give FedEx an unqualified right to terminate.  Under California law, the right to discharge at will is "[s]trong evidence in support of an employment relationship," *Tieberg*, 471 P.2d at 979, even though termination for cause is consistent with both employee and independent contractor status, *see Ruiz*, 2014 WL 2695534, at *11 ("[T]he parties' mutual termination provision is consistent with either an employer-employee or independent contractor relationship."); *cf. Foley v. Interactive Data Corp.*, 765 P.2d 373, 376 (Cal. 1988) (noting that, while California Labor Code § 2922 provides a presumption of at-will employment when employment is for no specified term, "[t]his presumption may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee").

FedEx's right under the OA to terminate its drivers, while broad, is somewhat constrained.  FedEx may fire a driver for any "breach[] or fail[ure] to perform . . . contractual obligations," which would cover, for example, any failure to act "with proper decorum at all times," or to "foster the professional image and good reputation of FedEx." We conclude that this factor does not favor FedEx enough to allow a finding that its drivers are independent contractors. *See Toyota Motor Sales*, 269 Cal. Rptr. at 653 ("The real test [for ascertaining whether the right to control exists] has been said to be whether the employee was subject to the employer's orders and control and was liable to be discharged for disobedience or misconduct." (internal quotation marks omitted)).

The second factor, distinct occupation or business, favors plaintiffs.  As the California Court of Appeal reasoned in

*Estrada*, "the work performed by the drivers is wholly integrated into FedEx's operation. The drivers look like FedEx employees, act like FedEx employees, [and] are paid like FedEx employees." 64 Cal. Rptr. 3d at 334. "The customers are FedEx's customers, not the drivers' customers." *Id*. at 336–37. While the drivers have opportunities to expand their businesses by taking on additional routes and hiring helpers, these opportunities themselves are only available subject to FedEx's business needs.

The third factor, whether the work is performed under the principal's direction, slightly favors plaintiffs. As explained above, although drivers retain freedom to determine several aspects of their day-to-day work, FedEx also closely supervises their work through various methods.

The fourth factor, the skill required in the occupation, also favors plaintiffs. FedEx drivers "need no experience to get the job in the first place and [the] only required skill is the ability to drive." *Id*. at 337; *see JKH Enters.*, 48 Cal. Rptr. 3d at 579 ("[T]he functions performed by the drivers, pick-up and delivery of papers or packages and driving in between, did not require a high degree of skill.").

The fifth factor, the provision of tools and equipment, slightly favors FedEx. The drivers provide their own vehicles and are not required to get other equipment from FedEx. On the other hand, "FedEx is involved in the purchasing process, providing funds and recommending vendors." *Estrada*, 64 Cal. Rptr. 3d at 334. Indeed, the drivers' scanners are not readily available anywhere else. Ultimately, the vast majority of drivers get their other equipment from FedEx. *See Ruiz*, 2014 WL 2695534, at *10 (holding that, where "Affinity

supplied the drivers with the major tools of the job by encouraging or requiring that the drivers obtain the tools from them through paid leasing arrangements," this factor favored employee status). Moreover, numerous California cases find employee status even though the employee provides his own vehicle or tools. *See, e.g.*, *Borello*, 769 P.2d at 409; *Estrada*, 64 Cal. Rptr. 3d at 331; *Air Couriers*, 59 Cal. Rptr. 3d at 47; *JKH Enters.*, 48 Cal. Rptr. 3d at 569; *Toyota Motor Sales*, 269 Cal. Rptr. at 654.

The sixth factor, length of time for performance of services, favors plaintiffs. Drivers enter into the OA for a term of one to three years. At the end of the initial term, the OA provides for automatic renewal for successive one-year terms if there is no notice of non-renewal by either party.

> [T]he length and indefinite nature of the plaintiff [d]rivers' tenure with [FedEx] . . . point toward an employment relationship. . . . This was not a circumstance where a contractor was hired to perform a specific task for a defined period of time. There was no contemplated end to the service relationship at the time that the plaintiff [d]rivers began working for [FedEx].

*Narayan*, 616 F.3d at 903; *see also Antelope Valley Press v. Poizner*, 75 Cal. Rptr. 3d 887, 900 (2008) ("[T]he notion that an independent contractor is someone hired to achieve a specific result that is attainable within a finite period of time . . . is at odds with carriers who are engaged in prolonged service to [an employer]."); *Air Couriers*, 59 Cal. Rptr. 3d at 47 (holding that, where many drivers had worked for "years,"

these "lengthy tenures" were "inconsistent with independent contractor status").

The seventh factor, method of payment, is neutral. FedEx pays its drivers according to a complicated scheme that includes fixed and variable components and ties payment to, among other things, packages, stops, and the ratio of driving time to deliveries. This payment method cannot easily be compared to either hourly payment (which favors employee status) or per-job payment (which favors independent contractor status). However, "[w]here, as here, there is ample independent evidence that the employer has the right to control the actual details of the [employee's] work . . . , the fact that . . . the employee is paid by the job rather than by the hour appears to be of minute consequence." *Tieberg*, 471 P.2d at 982; *see also Varisco v. Gateway Sci. & Eng'g, Inc.*, 83 Cal. Rptr. 3d 393, 398 (Ct. App. 2008) ("An hourly rate traditionally indicated an employment relationship but independent contractors are now commonly paid on that basis." (citation omitted)); *Germann*, 176 Cal. Rptr. at 874 ("[P]ayment may be measured by time, by the piece, or by successful completion of the service, instead of a fixed salary, and still constitute employee wages if other factors indicate an employer-employee relationship." (internal quotation marks omitted)).

The eighth factor, whether the work is part of the principal's regular business, favors plaintiffs. The work that the drivers perform, the pickup and delivery of packages, is "essential to FedEx's core business." *Estrada*, 64 Cal. Rptr. 3d at 334; *see also Huggins*, 592 F.3d at 859 (noting that drivers "performed work that was the essence of FedEx's business, namely, 'transportation and delivery service'").

The final factor, the parties' beliefs, slightly favors FedEx. The OA expressly identifies the relationship as one of an independent contractor, and disclaims any authority on FedEx's part to direct drivers as to the manner or means of their work. This disclaimer is belied by provisions of the OA and FedEx's policies and procedures, which in fact allow FedEx to control significant aspects of the drivers' day-to-day jobs, and it therefore provides only limited insight into the drivers' state of mind. However, when all justifiable inferences are drawn in FedEx's favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the OA's statement of independent contractor status is evidence that the drivers believed that they were entering such a relationship. Ultimately, though, "neither [FedEx]'s nor the drivers' own perception of their relationship as one of independent contracting" is dispositive. *See JKH Enters.*, 48 Cal. Rptr. 3d at 580; *Grant v. Woods*, 139 Cal. Rptr. 533, 537 (Ct. App. 1977) ("[T]he belief of the parties as to the legal effect of their relationship is not controlling if as a matter of law a different relationship exists.").

### 3. Summary

Viewing the evidence in the light most favorable to FedEx, the OA grants FedEx a broad right to control the manner in which its drivers' perform their work. The most important factor of the right-to-control test thus strongly favors employee status. The other factors do not strongly favor either employee status or independent contractor status. Accordingly, we hold that plaintiffs are employees as a matter of law under California's right-to-control test.

### C. FedEx's Conditional Cross-Appeal

FedEx argues that we should decertify the class if—but only if—we rely on individualized evidence in reversing the MDL Court's grant of summary judgment to FedEx. Our decision does not rely on any individualized evidence. FedEx's argument is therefore unavailing.

### Conclusion

We hold that plaintiffs are employees as a matter of law under California's right-to-control test. Accordingly, we reverse both the MDL Court's grant of summary judgment to FedEx and its denial of plaintiffs' motion for partial summary judgment. We remand to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status.

**REVERSED and REMANDED.**

TROTT, Circuit Judge, with whom GOODWIN, Circuit Judge, joins, concurring:

The resolution of this case as a matter of granting summary judgment to the drivers is far from simple, as the length and complexity of Judge Fletcher's meticulous opinion demonstrates. It has not been made easier by FedEx's brief, which, by quoting part of a sentence from an admission — but not all of it — creates a rosier picture of the drivers' state of mind than the record supports.

FedEx represents in its brief, and I quote, that each of the drivers personally "intended to enter an independent contractor relationship with [FedEx]." What the brief omits are the important words that precede this language and the final sentence in the drivers' response. This is what the drivers admitted:

> Named plaintiffs admit that on the day they signed their original Operating Agreement, *in reliance on Defendants' statements that they would be an independent contractor*, they intended to enter into an independent contractor relationship with Defendants. Named Plaintiffs deny, however, that an independent contractor relationship ever, in fact, existed between them and Defendants.

Response to Request for Admission No. 1 (emphasis supplied). The meaning of this response read as a whole is that the drivers believed they were becoming true independent contractors, but the reality they encountered was different.

We also find the actual meaning of the drivers' "admission" in this case in a companion case, *Slayman v. FedEx Ground Package System, Inc.*, Nos. 12-35525 and 12-35559. In that case, drivers pursued a personal claim in Oregon district court for rescission, claiming fraud. In denying summary judgment to both parties on the sole ground that the claim was not timely, the district court noted that "[d]eposition testimony indicate[d] that soon after becoming a driver, each plaintiff believed that the [Operating Agreement], despite its express terms, did not give the driver

the control he expected as an independent contractor." *Slayman v. FedEx Ground Package Sys., Inc.*, 3:05-cv-1127-HZ, 2012 WL 1902601, at \*7 (D. Or. May 25, 2012). All that glittered turned out not to be gold.

Once again, we learn the regrettable lesson that the basic information we require to resolve a controversy is not always found in the parties' briefs, but in the ungilded record itself. A good rule in this business is to verify before you trust. Lawyers would be well advised not to elide the truth, the whole truth, and nothing but the truth.

Judge Fletcher's analysis of the demands of California law is correct. Although *Estrada* went to the Court of Appeal after a contested trial — not on a grant of summary judgment to the drivers — we would be misguided to ignore what the California Court of Appeal said in that case, as well as the particulars of the test set out by the California Supreme Court in *Borello*, which does not embrace the "entrepreneurial opportunities" test, as a gloss or otherwise.

Abraham Lincoln reportedly asked, "If you call a dog's tail a leg, how many legs does a dog have?" His answer was, "Four. Calling a dog's tail a leg does not make it a leg." Justice Cardozo made the same point in *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 62 (1935), counseling us, when called upon to characterize a written enactment, to look to the "underlying reality rather than the form or label." The California Supreme Court echoed this wisdom in *Borello*, saying that the "label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." 769 P.2d at 403. As noted by Judge Fletcher, "[N]either [FedEx's] nor the drivers' own perception of their

relationship as one of independent contracting" is dispositive. *JKH Enters., Inc.*, 48 Cal. Rptr. at 580.

Bottom line?   Labeling the drivers "independent contractors" in FedEx's Operating Agreement does not conclusively make them so when viewed in the light of (1) the entire agreement, (2) the rest of the relevant "common policies and procedures" evidence, and (3) California law. As Judge Fletcher points out, the MDL decision to the contrary relied on an inappropriate consideration: the entrepreneurial opportunities factor.

Although our decision substantially unravels FedEx's business model, FedEx was not entitled to "write around" the principles and mandates of California Labor Law by constructing a contract which, after a contested trial, the California trial court in *Estrada* called:

> [A] brilliantly drafted contract creating the constraints of an employment arrangement with [the drivers] in the guise of an independent contractor model — because FedEx not only has the right to control, but has close to absolute control over [the drivers] based upon interpretation and obfuscation.

*Estrada*, 64 Cal. Rptr. 3d at 334 (brackets in original) (internal quotations marks omitted).  The Court of Appeal in that case appropriately called the trial court's observation an application of the looks like, walks like, swims like, and quacks like a duck test.  *See id.* at 335.

Accordingly, I concur in Judge Fletcher's persuasive opinion.